IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF FLORIDA
TALLAHASSEE DIVISION

ALPHONSO SARAVIA
a/k/a ALPHONSO S. MACHUCA,
      Petitioner,

vs.                                                                Case No. 4:07cv119/MMP/EMT

WALTER A. McNEIL,[1]
      Respondent.
_____/

## ORDER, REPORT AND RECOMMENDATION

      This cause is before the court on Petitioner's amended petition for writ of habeas corpus filed under 28 U.S.C. § 2254 (Doc. 8).   Respondent filed an answer to the petition, which was subsequently amended, and relevant portions of the state court record (Docs. 15, 22).  Petitioner filed reply briefs (Docs. 18, 25).

      The matter is referred to the undersigned magistrate judge for report and recommendation pursuant to 28 U.S.C. § 636 and N. D. Fla. Loc. R. 72.2(b).  After careful consideration of all issues raised by Petitioner, it is the opinion of the undersigned that no evidentiary hearing is required for the disposition of this matter, Rules Governing Section 2254 Cases 8(a).  It is further the opinion of the undersigned that the pleadings and attachments before the court show that Petitioner is not entitled to relief.

I.      BACKGROUND AND PROCEDURAL HISTORY

      The relevant aspects of the procedural background of this case are undisputed and established by the state court record (*see* Docs. 15, 22, Exhibits).  Petitioner was indicted in the Circuit Court

---

[1]Walter A. McNeil succeeded James McDonough as Secretary for the Department of Corrections, and is automatically substituted as Respondent.  *See* Fed. R. Civ. P. 25(d)(1).

for Suwannee County, Florida, on one count of aiding and abetting first degree murder, one count of aiding and abetting shooting at or into an occupied motor vehicle, one count of aiding and abetting shooting into a dwelling, and two counts of aiding and abetting discharging a firearm within 1000 feet of a person (Doc. 15, Ex. A at 1–3).   Following a jury trial, Petitioner was convicted of one count of aiding and abetting second degree murder with a firearm (Count 1), one count of aiding and abetting shooting into an occupied motor vehicle (Count 2), one count of aiding and abetting shooting into a dwelling (Count 5), and two counts of aiding and abetting discharging a firearm within 1000 feet of a person (Counts 3 and 6) (*id.* at 89–90).   On April 23, 1997, Petitioner was sentenced to life imprisonment on Count 1 and consecutive terms of fifteen (15) years on each of the remaining counts, to run consecutive to the life sentence and with pre-sentence jail credit of 431 days (*id.* at 114–38).

Petitioner appealed the judgment to the Florida First District Court of Appeals ("First DCA").   On July 12, 1999, the First DCA affirmed the judgment of conviction without written opinion, with the mandate issuing July 28, 1999 (Doc. 15, Ex. M).   Machuca v. State, 737 So. 2d 1082 (Fla. 1st DCA July 12, 1999) (Table).   Petitioner did not seek certiorari review by the Florida Supreme Court or the United States Supreme Court.

On September 14, 1999, Petitioner filed a motion for postconviction relief pursuant to Rule 3.850 of the Florida Rules of Criminal Procedure (Doc. 15, Ex. N at 1–16).   The trial court summarily denied the motion in a written opinion rendered on April 5, 2002 (*id.* at 22–23).   Petitioner appealed the decision to the First DCA, and the appellate court reversed and remanded the case to the trial court for further proceedings, with the mandate issuing April 22, 2002 (*id.*, Ex. W).   Saravia v. State, 841 So. 2d  (Fla. 1st DCA Apr. 3, 2002).   On remand, the trial court again summarily the denied the motion in a written opinion rendered on June 30, 2006 (*id.*, Ex. X at 137–41).   Petitioner appealed the decision to the First DCA, and the appellate court affirmed per curiam without written opinion on January 19, 2007, with the mandate issuing February 14, 2007 (*id.*, Ex. AA).   Saravia v. State, 947 So. 2d  (Fla. 1st DCA Jan. 19, 2007).

On February 14, 2007, Petitioner filed a motion to correct illegal sentence pursuant to Rule 3.800(a) of the Florida Rules of Criminal Procedure (Doc. 22, Ex. BB).   The trial court granted the motion and resentenced Petitioner on November 27, 2007, to life imprisonment on Count 1 and

concurrent terms of fifteen (15) years' imprisonment on the remaining counts (*see id.*, Exs. FF, GG). *See* Notice of Appeal, <u>State v. Saravia</u>, No. 96-47-CF (Suwannee County Cir. Ct. Dec. 4, 2007). Petitioner appealed the resentencing judgment to the First DCA, and that proceeding is still pending. *See* Docket Sheet, <u>Saravia v. State</u>, Case No. 1D07-6184 (Fla. 1st DCA).

On March 22, 2007, while Petitioner's Rule 3.800 motion was pending, Petitioner filed the instant habeas action (Doc. 1 at 1).  Respondent concedes that the petition is timely (Doc. 22 at 2).

II.    STANDARD OF REVIEW

Section 2254(a) of Title 28 provides that "a district court shall entertain an application for a writ of habeas corpus in behalf of a person in custody pursuant to the judgment of a State court" upon a showing that his custody is in violation of the Constitution or laws of the United States.  As the instant petition was filed after April 24, 1996, it is subject to the more deferential standard for habeas review of state court decisions under § 2254 as brought about by the Anti-Terrorism and Effective Death Penalty Act of 1996 (AEDPA).  Pub.L. 104-132, § 104, 110 Stat. 1214, 1218-19. In relevant part, section 2254(d) now provides:

> (d)  An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim–
>> (1)  resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>> (2)  resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C.A. § 2254 (2002).

The United States Supreme Court explained the framework for § 2254 review in <u>Williams v. Taylor</u>, 529 U.S. 362, 120 S. Ct. 1495, 146 L. Ed. 2d 389 (2000).[2]  The appropriate test was described by Justice O'Connor as follows:

---

[2] Unless otherwise noted, references to <u>Williams</u> are to the majority holding, written by Justice Stevens for the Court (joined by Justices O'Connor, Kennedy, Souter, Ginsburg, and Breyer) in parts I, III, and IV of the opinion (529 U.S. at 367–75, 390–99); and Justice O'Connor for the Court (joined by Justices Rehnquist, Kennedy, Thomas, and—except as to the footnote—Scalia) in part II (529 U.S. at 403–13).  The opinion of Justice Stevens in Part II was joined by Justices Souter, Ginsburg, and Breyer.

> In sum, § 2254(d)(1) places a new constraint on the power of a federal habeas court to grant a state prisoner's application for a writ of habeas corpus with respect to claims adjudicated on the merits in state court.  Under § 2254(d)(1), the writ may issue only if one of the following two conditions is satisfied—the state court adjudication resulted in a decision that (1) "was contrary to . . . clearly established Federal law, as determined by the Supreme Court of the United States," or (2) "involved an unreasonable application of . . . clearly established Federal law, as determined by the Supreme Court of the United States."  Under the "contrary to" clause, a federal habeas court may grant the writ if the state court arrives at a conclusion opposite to that reached by this court on a question of law or if the state court decides a case differently than this Court has on a set of materially indistinguishable facts.  Under the "unreasonable application" clause, a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from this Court's decisions but unreasonably applies that principle to the facts of the prisoner's case.

*Id.*, 529 U.S. at 412–13 (O'Connor, J., concurring); Ramdass v. Angelone, 530 U.S. 156, 120 S. Ct. 2113, 2119–20, 147 L. Ed. 2d 125 (2000).  In employing this test, the Supreme Court has instructed that on any issue raised in a federal habeas petition upon which there has been an adjudication on the merits in a formal State court proceeding, the federal court should first ascertain the "clearly established Federal law," namely, "the governing legal principle or principles set forth by the Supreme Court at the time the state court render[ed] its decision."  Lockyer v. Andrade, 538 U.S. 63, 71–72, 123 S. Ct. 1166, 155 L. Ed. 2d 144 (2003).  The law is "clearly established" if Supreme Court precedent at the time "would have compelled a particular result in the case."  Neelley v. Nagle, 138 F.3d 917, 923 (11th Cir. 1998), *overruled on other grounds by* Parker v. Head, 244 F.3d 813, 835 (11th Cir. 2001).

Next, the court must determine whether the State court adjudication is contrary to the clearly established Supreme Court case law, either because "'the state court applies a rule that contradicts the governing law set forth in [the Supreme Court's] cases' or because 'the state court confronts a set of facts that are materially indistinguishable from a decision of th[e] [Supreme] Court and nevertheless arrives at a result different from [Supreme Court] precedent.'"  Lockyer, 538 U.S. at 73 (quoting Williams, 529 U.S. at 405–06).  The Supreme Court has clarified that "[a]voiding these pitfalls does not require citation to our cases—indeed, it does not even require awareness of our cases, so long as neither the reasoning nor the result of the state-court decision contradicts them."

Early v. Packer, 537 U.S. 3, 8, 123 S. Ct. 362, 365, 154 L. Ed. 2d 263 (2002) (quoting Williams, 529 U.S. at 405–06). If the State court decision is found in either respect to be contrary, the district court must independently consider the merits of the petitioner's claim.

If on the other hand, the State court applied the correct Supreme Court precedent and the facts of the Supreme Court cases and the petitioner's case are not materially indistinguishable, the court must go to the third step and determine whether the State court "unreasonably applied" the governing legal principles set forth in the Supreme Court's cases. The standard for an unreasonable application inquiry is "whether the state court's application of clearly established federal law was objectively unreasonable." Williams, 529 U.S. at 409. Whether a State court's decision was an unreasonable application of legal principle must be assessed in light of the record the court had before it. Holland v. Jackson, 542 U.S. 649, 652, 124 S. Ct. 2736, 2737–38, 159 L. Ed. 2d 683 (2004) (per curiam); cf. Bell v. Cone, 535 U.S. 685, 697 n.4, 122 S. Ct. 1843, 1851 n.4, 152 L. Ed. 2d 914 (2002) (declining to consider evidence not presented to state court in determining whether its decision was contrary to federal law). An objectively unreasonable application of federal law occurs when the State court "identifies the correct legal rule from Supreme Court case law but unreasonably applies that rule to the facts of the petitioner's case" or "unreasonably extends, or unreasonably declines to extend, a legal principle from Supreme Court case law to a new context." Putman v. Head, 268 F.3d 1223, 1241 (11th Cir. 2001). The State court's incorrect or erroneous application of clearly established law will be held to be reasonable and not warrant a writ so long as the State court adjudication results in a "satisfactory conclusion." Williams, 529 U.S. at 410–12.

Section 2254(d) also allows federal habeas relief for a claim adjudicated on the merits in State court where that adjudication "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d)(2). The Supreme Court has clarified that: "a decision adjudicated on the merits in a state court and based on a factual determination will not be overturned on factual grounds unless objectively unreasonable in light of the evidence presented in the state-court proceeding." Miller-El v. Cockrell, 537 U.S. 322, 340, 123 S. Ct. 1029, 1041, 154 L. Ed. 2d 931 (2003) (dictum).

When performing its review under § 2254(d), the federal court must bear in mind that any "determination of a factual issue made by a State court shall be presumed to be correct," and the

petitioner bears "the burden of rebutting the presumption of correctness by clear and convincing evidence." 28 U.S.C. § 2254(e)(1); *see e.g.* Miller-El, 537 U.S. at 340 (explaining that a federal court can disagree with a state court's factual finding and, when guided by AEDPA, "conclude the decision was unreasonable or that the factual premise was incorrect by clear and convincing evidence"); Jones v. Walker, 469 F.3d 1216, 1226–27 (11th Cir. 2007) (holding that § 2254(d)(2)'s "unreasonable determination" standard "must be met by clear and convincing evidence," and concluding that that standard was satisfied where prisoner showed "clearly and convincingly" that the state court's decision "contain[ed] an 'unreasonable determination' of fact.").

Only if the federal habeas court finds that the petitioner satisfied AEDPA, and § 2254(d), does the court take the final step of conducting an independent review of the merits of the petitioner's claims. *See* Panetti v. Quarterman, --- U.S. --- 127 S. Ct. 2842, 2858, 168 L. Ed. 2d 662 (2007); Jones, 469 F.3d 1216 (same). The writ will not issue unless the petitioner shows that he is in custody "in violation of the Constitution or laws and treaties of the United States." 28 U.S.C. § 2254(a).

Within this framework, the court will review Petitioner's claims.

III. PETITIONER'S CLAIMS

Ground one:  Evidence was legally insufficient to support conviction.

Petitioner claims that the evidence was insufficient to support his conviction for aiding and abetting second degree murder (Doc. 8 at 4). Petitioner states an essential element of second degree murder is proof that the fatal act was done out of ill will, hatred, spite, or an evil intent, and the evidence was not sufficient to establish these elements (*id.* at 4–4A).

Respondent contends Petitioner did not fairly present the federal nature of his claim to the state courts (Doc. 22 at 6–7). Respondent contends that although Petitioner raised a sufficiency of the evidence claim on direct appeal of his conviction, he did not cite the Constitution or federal law and relied exclusively on state law (*id.*). Furthermore, Petitioner cannot return to state court to exhaust the claim; therefore, the claim is procedurally barred from federal review (*id.*). Moreover, Petitioner has failed to show cause and prejudice to overcome the procedural bar (*id.*). Therefore, the habeas petition should be denied. Alternatively, Respondent contends Petitioner is not entitled

to relief because the testimony of Co-defendant Alex Rodas was sufficient to establish each element of the offense (*id.* at 7–9).

The court liberally construes Petitioner's pro se federal petition as asserting a federal due process challenge to the sufficiency of the evidence to support the conviction for aiding and abetting second degree murder.  Review of the state court record shows that in Petitioner's direct appeal of his conviction, he claimed that the evidence was insufficient to support a conviction for second degree murder because there was no evidence that Petitioner acted with ill will, spite, hatred, or evil intent (Doc. 15, Ex. J at 27–37).  In Mulnix v. Secretary for Dept. of Corrections, 254 Fed. Appx. 763 (11th Cir. 2007), the Eleventh Circuit addressed the exhaustion issue presented in the instant case.  Mulnix was convicted of second degree murder in the State of Florida.[3]  *Id.* at 764.  In his federal habeas petition Mulnix asserted a federal due process challenge to the sufficiency of the evidence, but on direct appeal of his conviction in the state courts he asserted his claim under state law.  *Id.*  The district court denied the federal petition on the ground that Mulnix failed to fairly present a federal claim on direct appeal in the state courts.  *Id.*  The Eleventh Circuit noted that Florida courts assess the sufficiency of the evidence used to convict criminal defendants under a legal standard identical to the one used by federal courts in deciding federal due process challenges to the sufficiency of the evidence.  *Id.*  The Eleventh Circuit held that because the state court analyzed Mulnix's due process sufficiency of the evidence claim using a standard identical to the federal law standard, the federal claim was exhausted.  *Id.* at 765.  The undersigned finds the Mulnix decision persuasive, and therefore, concludes that Petitioner exhausted his federal due process sufficiency of the evidence claim.

      1.     Clearly Established Supreme Court Law

As an issue of federal law, Petitioner's claim derives from the Fourteenth Amendment due process requirement that the evidence presented at trial be sufficient to convict.  In determining whether Petitioner's conviction was obtained with constitutionally infirm evidence, reference must be made to the evidence needed to convict under state law.  Jackson v. Virginia, 443 U.S. 307, 324

---

[3]The undersigned cites Mulnix v. Secretary for Dept. of Corrections only as persuasive authority and recognizes that the opinion is not considered binding precedent.  *See* 11th Cir. R. 36-2.

& n.16, 99 S. Ct. 2781, 2792 n.16, 61 L. Ed. 2d 560 (1979).   To satisfy the constitutional requirement of due process during trial, the State must prove beyond a reasonable doubt every fact that constitutes an essential element of the crime charged against the defendant.   In re Winship, 397 U.S. 358, 364, 90 S. Ct. 1068, 1073, 25 L. Ed. 2d 368 (1970).   When reviewing a claim of insufficient evidence, the proper inquiry is not whether the reviewing court itself believes that the evidence established guilt beyond a reasonable doubt, but "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt."   Jackson, 443 U.S. at 319 (citation omitted).   The court should not reweigh the evidence but should view it in the light most favorable to the jury's verdict.   *Id.*   Because jurors are free to evaluate the credibility of testimony and the weight of the evidence, the court should assume that all conflicting inferences were resolved against the defendant. *Id.* at 326.   The test under Jackson is a limited one, and it does not require that the evidence rule out every hypothesis except that of guilt beyond a reasonable doubt.   *Id.*

> 2.      Federal Review of State Court Decision

Petitioner raised this claim of trial court error in denying defense counsel's motion for judgment of acquittal as his sole issue on direct appeal of his conviction (*see* Doc. 15, Ex. J at 27–37).   Although the First DCA's affirmance of the conviction without opinion provides no guidance to this court in determining the rationale for its decision, this court must still defer to the state court decision unless review of the record shows that decision to be unreasonable.   *See* Helton v. Secretary for Dept. of Corrections, 233 F.3d 1322, 1326–27 (11th Cir. 2000); Delgado v. Lewis, 223 F.3d 976, 982 (9th Cir. 2000); Hannon v. Cooper, 109 F.3d 330, 335 (7th Cir. 1997).

> a.      State Law

Petitioner was charged with aiding and abetting Alex Rodas in the premeditated murder of Dana Marie Holbrook (Doc. 15, Ex. A at 1–2).   The jury convicted Petitioner of the lesser included offense of aiding and abetting second degree murder.   Under Florida law in effect at the time of Petitioner's offense conduct, second degree murder was defined as follows:

> The unlawful killing of a human being, when perpetrated by any act imminently dangerous to another and evincing a depraved mind regardless of human life, although without any premeditated design to effect the death of any particular individual, is murder in the second degree and constitutes a felony of the first degree,

punishable by imprisonment for a term of years not exceeding life or as provided in
s. 775.082, s. 775.083, or s. 775.084.

Fla. Stat. § 782.04(2) (1995). Thus, to prove the crime of aiding and abetting second degree murder,

the State was required to prove the following elements beyond a reasonable doubt:  (1) the victim,

Dana Marie Holbook is dead, (2) the death was caused by the criminal act or agency of Alex Rodas,

(3) there was an unlawful killing of Dana Marie Holbrook by an act imminently dangerous to

another and evincing a depraved mind regardless of human life, and (4) Petitioner unlawfully aided,

abetted, counseled, hired, or otherwise procured Alex Rodas to commit the offense.  *See* The Florida

Bar 2007 Florida Standard Jury Instructions in Criminal Cases, Fifth Edition, Part Two:  Instruction

on Crimes, Chapter 7.4 Murder - Second Degree (2007) (instruction adopted in 1981 and amended

in 1997 to omit "or agency" from second element).  An act is ""imminently dangerous to another

and demonstrating a depraved mind" if it is an act or series of acts that:  (1) a person of ordinary

judgment would know is reasonably certain to kill or do serious bodily injury to another, and (2) is

done from ill will, hatred, spite or an evil intent, and (3) is of such a nature that the act itself

indicates an indifference to human life.  *Id.*; Conyers v. State, 569 So. 2d 1360, 1361 (Fla. 1st DCA

1990) (citation omitted).  In order to convict of aiding and abetting second degree murder, it is not

necessary for the State to prove the defendant had an intent to cause death.  *Id.*


Florida courts have further defined the intent element of second degree murder:

> "Depraved mind" within the second degree murder statute has been variously
> defined as importing malice in the sense of ill will, hatred, or evil intent, and as an
> inherent deficiency of moral sense and rectitude.  Ramsey v. State, 114 Fla. 766, 154
> So. 2d 855.  It has also been stated that malice is not limited in its meaning to hatred,
> ill will and malevolence, but "denotes a wicked and corrupt disregard of the lives and
> safety of others . . . a failure to appreciate social duty."  40 Am. Jur. 2d, Homicide,
> Section 50.

Hines v. State, 227 So. 2d 334, 335–36 (Fla. 1st DCA 1969).

The Florida courts have recognized that within the category of second degree murder there

exist varying gradations of cases because some acts are simply more depraved than others.  *Compare*

Hines v. State, 227 So. 2d 334 (Fla. 1st DCA 1969) (act of purposely pointing gun at deceased's

head from a very short distance and telling deceased that he "had a gun" and that she (the deceased) "should go out . . . and act like a squirrel and if he killed her . . . it wouldn't be no accident," certainly implied malice sufficient to support conviction for second degree murder even if defendant did not intend that the gun would fire), *and* Grissom v. State, 237 So. 2d 57 (Fla. 3d DCA 1970) (evidence was sufficient to support conviction for second degree murder of student where defendant, a junior high school student, was disciplined by a teacher for a rule violation; upon being disciplined, the defendant threatened to return and kill the teacher; a short time later he did return armed with a handgun and fired two shots at the teacher, wounding but not killing him; and while fleeing the building after shooting the teacher, he fired one shot up a stairway in the school building that struck and killed a student standing on the stairs), *with* Manuel v. State, 344 So. 2d 1317 (Fla. 3d DCA 1977) (defendant's act of pointing gun in a direction where one would think a shot could not result in harm to any person is conduct that falls far short of malice required to support conviction for second degree murder).

b.      Trial Evidence of Intent

The evidence offered by the State to show Petitioner's intent with regard to the killing of Dana Holbrook was the testimony of Alex Rodas, one of Petitioner's co-defendants, and testimony of Laura Mendoza, Chris Holbrook, and John Paul Roberts.  Mr. Rodas began his trial testimony by identifying Petitioner as Alphonso Saravia (Doc. 15, Ex. F at 318–20).  He testified that Petitioner was known as "Poncho," and Petitioner's girlfriend was Laura Mendoza (*id.* at 320).  Mr. Rodas testified that at 11:00–11:30 on the evening of February 10, 1996, Petitioner came to his house driving a cream-colored Pontiac (*id.* at 321).  Petitioner told Mr. Rodas that he (Petitioner) had a problem and wanted Rodas to go with him somewhere (*id.* at 323).  Mr. Rodas sat in the front passenger seat of Petitioner's car, and Petitioner told him that he wanted to kill a man (*id.* at 324–25).  Petitioner reached under the seat and gave Mr. Rodas a beer and a gun, and told Rodas that they would use the gun to "take care of" the man (*id.* at 326–27).  Mr. Rodas testified that he had never handled a gun before, and saw a button on the gun which he assumed was the safety, so he pressed it (*id.* at 328).  When he pressed the button, the cylinder came out and the bullets fell into his lap and under the seat (*id.* at 329).  Petitioner stopped the car, and Mr. Rodas tried to pick up the bullets and calm Petitioner (*id.* at 329–30).  Mr. Rodas got back into the car, and Petitioner said he

needed to pick someone up at a bar (*id.* at 330).  The two proceeded to the Yellow Rose Bar, and Martin Palma-Ramos, the third co-defendant, jumped into the back seat of the car (*id.* at 332). Martin Ramos asked Petitioner if they were still going to do what they had talked about, and Petitioner responded affirmatively (*id.* at 320, 332–33).

Mr. Rodas testified that Petitioner drove the car onto Highway 90, and Rodas inferred from the conversation between Petitioner and Martin Ramos that Ramos had a "problem" concerning a vehicle (*id.* at 334).  Alex Rodas suggested that they simply damage the vehicle, but the two other men insisted they wanted to go inside a house and shoot (*id.* at 335).  Martin Ramos then agreed with Rodas about shooting the vehicle, but Petitioner did not respond (*id.*).  Petitioner kept driving and  told Rodas that he wanted him to do the shooting (*id.* at 336–37).  Petitioner asked Rodas if he had ever shot a gun before, and Rodas lied and told him that he had (*id.* at 337).  Petitioner turned off the road and started yelling, telling Rodas that a little trailer was the house where the people lived who they were targeting (*id.* at 338).  They circled the block, and Petitioner pointed to a truck parked to the left side of the trailer, but they were too far past the truck to shoot it, so they went around the block a second time (*id.*).  When they passed the trailer a third time, Petitioner slowed the car, turned off the lights, and nearly stopped in front of the trailer (*id.*).  Petitioner yelled at Rodas to start shooting, and Martin Ramos told Rodas to shoot the windows or tires of the truck, so Rodas pointed the gun outside the window and shot once or twice (*id.* at 339).  Petitioner sped away, and he and Martin Ramos began cheering (*id.* at 340).  Ramos then told Petitioner that Rodas failed to hit the window or tires of the truck, and Petitioner got upset, telling Rodas he didn't know what he was doing and couldn't shoot (*id.* at 340–41).  Petitioner told Rodas he wanted to go back and shoot a man, and he wanted "to do it right" to show everyone that they were the "baddest people in Live Oak" (*id.* at 342–43).  Rodas told Petitioner there were no bullets in the gun, and the police would be coming, so he should forget about it (*id.* at 343).

Petitioner then started heading towards Interstate 10 (*id.* at 343).  Mr. Rodas had placed the gun on the seat between Petitioner and him (*id.* at 344).  Petitioner bragged to Ramos that they showed everyone that they were the "baddest people in Live Oak" and not to mess with them again (*id.* at 345).  As they entered Interstate 10, Rodas observed that the other vehicles on the highway moved to the passing lane to allow Petitioner to enter the highway, and the cars then returned to the

right lane (*id.*).  Mr. Rodas testified that Petitioner was driving very fast, close to 90 miles per hour, and passed all of the cars that had returned to the right lane (*id.* at 346).  Rodas told Petitioner to slow down and noticed that Petitioner was playing with the gun (*id.*).  A pickup truck drove beside them, and Petitioner shoved the gun towards Rodas and told him to shoot the truck (*id.* at 346–47). Rodas believed the gun was unloaded because he remembered emptying the cylinder (*id.* at 347). Petitioner was screaming at Rodas to shoot the truck, and Ramos began telling Rodas to shoot, so Rodas pointed the gun out the window and pulled the trigger twice (*id.*).  The gun clicked but nothing came out (*id.* at 347–48).  Petitioner again said, "What happened?  I thought I told you to shoot.  Don't you know what you are doing?" (*id.* at 348).  Rodas responded, "Hey, man, you know there ain't no bullets in the gun, man.  Chill out" (*id.*).  Rodas then placed the gun back on the seat between Petitioner and him (*id.*).  Petitioner then grabbed the gun, opened the cylinder, shoved it towards Rodas, showed it to him and said, "There is bullets in the gun . . . just got to know what you are doing" (*id.* at 348–49).  By this time, the car in which Dana Holbrook was the passenger was beside Petitioner's (*id.* at 349).  Petitioner was "going back and forth," trying to stay parallel with the other car (*id.*).  Petitioner then yelled at Rodas to shoot at the car, so Rodas grabbed the gun, and Ramos also started telling him to shoot (*id.*).  Rodas put the gun outside the car window and pressed the trigger twice, and two bullets shot out (*id.* at 349–50).  The prosecutor asked Rodas whether it was his intention to shoot the bullets at the car, and Rodas responded:

> I wasn't—I wasn't thinking, you know, about I am going to shoot these people, or I'm going to shoot this car, or anything much.  I was just doing what Alphonso was telling me to do, you know.  And I know that sounds like I ain't got no brain, or whatever, you know.  But at that moment, everything was going by so fast that–that I didn't have time to react otherwise.  (Witness crying.)

(*id.* at 350).  Rodas testified that he saw the male driver of the other car move toward the steering wheel, and he saw that the rear window of the car was smashed (*id.*).  Rodas told Petitioner to get out of there, and Petitioner sped up (*id.* at 351).  Petitioner then told Ramos again that they were the "baddest people in Live Oak" and that nobody was going to "f—" with them (*id.*).

Mr. Rodas testified that he pled guilty to second degree murder and the four other felonies charged in the indictment (*id.* at 355).  He testified that as part of the plea agreement, the State agreed to recommend a sentence of 38.6 years of imprisonment, but his actual sentence would be

determined by the judge (*id.* at 355–56).  Rodas testified that when the judge accepted his plea, the judge told him that he could receive up to life imprisonment, and the probation officer recommended a life sentence (*id.* at 356).

Arlene Ivey testified that her brother owned the property on which the trailer that Rodas shot at was located (Doc. 15, Ex. E at 233).  She stated that in the early morning hours of February 11, 1996, she was in her car approximately 300 feet from the trailer and observed a car driving very fast past the trailer (*id.* at 236–37).  The car drove past the trailer a second and third time very fast, and the third time, she saw the car almost stop and gunshots come from the passenger side window (*id.* at 238–40).  Ms. Ivey identified photographs of the car from which she saw gunshots coming, and the photographs were admitted as evidence (*id.* at 241).

Laura Mendoza testified that she and Petitioner began dating in December of 1995 (*id.* at 297).  She testified that after Petitioner was arrested for the shootings, she visited him at the jail, and Petitioner told her that Martin Ramos "had done nothing" that night, that Alex did the shooting, and that he (Petitioner) wanted to do the shooting, but Alex offered (*id.* at 299–301).

Mr. Chris Holbrook, the husband of Dana Holbrook, testified that he, Dana, John Paul Roberts, and Amanda, John Paul's girlfriend, were traveling from Pensacola to Jacksonville on February 10, 1996 (*id.* at 135, 137–38).  He testified that he was driving, Dana was seated in the passenger's seat, John Paul was seated behind Dana, and Amanda was seated behind him (Chris) (*id.* at 140).  Mr. Holbrook testified that he was following a small truck on Interstate 10, and as they approached the entrance ramp from Highway 90, he noticed a white car enter the highway, so he and the small truck moved to the passing lane to allow the white car to enter (*id.* at 142).  Mr. Holbrook returned to the right lane, but then passed the white car and returned to the right lane (*id.*).  The white car then started passing him, got one car length beyond him in the passing lane, and then started slowing down and approaching closer to Holbrooks' car until all Holbrook could see was the hood of the white car to his left (*id.* at 143–44).  Mr. Holbrook commented to his wife that it looked like the white car was "playing games," and then he heard a bang and air rushing into the car (*id.* at 144, 148).  Mr. Holbrook heard John Paul say something, so he pulled the car to the side of the road (*id.* at 148).  When he turned on the dome light, he noticed blood and looked at his wife

because she had not said anything; he then noticed that she had been shot in the back of the head (*id.* at 148–49).

Mr. John Paul Roberts testified that he was asleep in the car and was awakened by Chris Holbrook saying something to Dana about "games" in an alarmed voice (*id.* at 160–61). Mr. Roberts testified that he saw a white car moving up and down alongside their vehicle in a racing motion (*id.* at 162). The white car moved forward and then eased back for at least 15–30 seconds (*id.* at 163). Mr. Roberts then heard a loud boom and covered his face (*id.*). Mr. Roberts felt something warm on his leg and told Chris that he was shot (*id.* at 166). Chris pulled to the side of the road and turned on the light, and John Paul saw blood on his leg (*id.*). John Paul then realized that the blood was coming from the back of Dana's head (*id.*).

Petitioner testified on his own behalf with the assistance of an interpreter. He admitted that the gun from which the shots were fired was his (Doc. 15, Ex. G at 443). He also admitted that he was driving his car that evening, and that his car was the vehicle shown in the trial photographs admitted into evidence as the vehicle involved in the shootings (*id.* at 447). Petitioner testified that Martin Ramos was already in the car when they picked up Alex Rodas, and he denied that he ever discussed with Rodas a plan whereby Rodas would shoot someone for Petitioner (*id.* at 448). Petitioner testified that the three of them drove to the trailer in Live Oak because Ramos wanted to talk to one of the occupants, but when they arrived, Ramos did not want to go inside the trailer because the occupants had visitors (*id.* at 449, 465). Petitioner testified that he circled the block a second and third time and by the third time, Alex Rodas noticed the gun on the floor of the car (*id.*). Petitioner testified that Rodas picked up the gun, and Martin Ramos told Rodas to shoot a truck parked near the trailer (*id.* at 449). Petitioner stated that Rodas shot several times, but he did not actually hit the truck (*id.* at 448–50). Petitioner then drove away (*id.* at 449). Petitioner denied that he was driving fast the first two times he circled the block (*id.* at 462–63).

Petitioner stated that when he got onto Interstate 10, he went to the left lane, but then it seemed that his car was not responding to his attempt to accelerate because his car and the car next to them were very close together (*id.* at 451). According to Petitioner, Rodas pulled the gun from his pants and said, "But this car isn't working," so Petitioner stepped on the gas (*id.* at 451–52). Petitioner testified that neither he nor Martin Ramos told Rodas to put the gun out the window (*id.*

at 452). Petitioner testified that Rodas said something in English, which he (Petitioner) could not understand, and then Rodas fired the gun two or three times, but it did not fire any bullets because it was not loaded (*id.*). Petitioner testified that he was not aware that anyone reloaded the gun (*id.* at 453). He testified that the gunshots scared him, so he drove back to Live Oak (*id.*). Petitioner admitted that after he was arrested and detained, he had a conversation with Laura Mendoza, but he denied that he told Ms. Mendoza that he had intended to do the shooting, but Alex Rodas volunteered (*id.* at 456). On cross-examination, Petitioner admitted that he made several false statements to the police (*id.* at 459–60).

The evidence, viewed in a light most favorable to the State, is sufficient to permit a rational juror to conclude beyond a reasonable doubt that Dana Marie Holbrook was unlawfully killed by an act that: (1) a person of ordinary judgment would know is reasonably certain to kill or do serious bodily injury to another, and (2) is done from ill will, hatred, spite or an evil intent, and (3) is of such a nature that the act itself indicates an indifference to human life. The testimony of Mr. Rodas that Petitioner shoved the gun toward him, showed him the bullets, and repeatedly ordered him to shoot at the Holbrooks' car, which was obviously occupied, and the testimony of Rodas, Mr. Holbrook, and Mr. Roberts that Petitioner was accelerating and decelerating alongside the Holbrooks' car just prior to Rodas' shooting at the Holbrooks' car was sufficient to indicate "a wicked and corrupt disregard of the lives and safety of others." *See* Hines, 227 So. 2d 334; Grissom, 237 So. 2d 57. Since a rational trier of fact could have found guilt beyond a reasonable doubt as to the aiding and abetting second degree murder count, the undersigned concludes that Petitioner failed to establish a due process violation; thus, the State appellate court did not contrarily or unreasonably apply clearly established Supreme Court law when it affirmed the trial court's denial of Petitioner's motion for acquittal on this charge.

     B.    <u>Ground two: "Double jeopardy violations."</u>

Petitioner claims that his convictions for aiding and abetting second degree murder, aiding and abetting shooting into an occupied motor vehicle, and aiding and abetting shooting from a vehicle within 1000 feet of a person arose from the same conduct, specifically, Mr. Rodas' shooting into the Holbrooks' car, in violation of the Double Jeopardy Clause (Doc. 1 at 4–4A). He additionally contends that his convictions for aiding and abetting shooting into a dwelling and the

second count of aiding and abetting shooting from a vehicle within 1000 feet of a person arose from the same conduct, specifically, Mr. Rodas' shooting at the truck near the trailer, and thereby constituted a double jeopardy violation (*id.* at 4A).  Respondent concedes that Petitioner exhausted this claim in the state courts (Doc. 22 at 9).

   1.   Clearly Established Supreme Court Law

   The Double Jeopardy Clause protects a defendant from multiple punishments for the same offense.  <u>Missouri v. Hunter</u>, 459 U.S. 359, 365–66, 103 S. Ct. 673, 678, 74 L. Ed. 2d 535 (1983); <u>North Carolina v. Pearce</u>, 395 U.S. 711. 717, 89 S. Ct. 2072, 2076, 23 L. Ed. 2d 656 (1969), *overruled on other grounds*, <u>Alabama v. Smith</u>, 490 U.S. 794, 109 S. Ct. 2201, 104 L. Ed. 2d 865 (1989).  "Where the same conduct violates two statutory provisions, the first step in the double jeopardy analysis is to determine whether the legislature . . . intended that each violation be a separate offense."  <u>Garrett v. United States</u>, 471 U.S. 773, 778, 105 S. Ct. 2407, 2411, 85 L. Ed. 2d 764 (1985)).  Although the Double Jeopardy Clause does not flatly prohibit the legislature from punishing the same conduct under two different statutes, federal courts assume that the legislature ordinarily does not intend to do so "'in the absence of a clear indication of contrary legislative intent.'"  <u>Hunter</u>, 459 U.S. at 366 (quoting <u>Whalen v. United States</u>, 445 U.S. 684, 691–92, 100 S. Ct. 1432, 1437–38, 63 L. Ed. 2d 715 (1980)); *see also* <u>Garrett</u>, 471 U.S. at 779 (holding that multiple punishments are permissible "when the legislative intent is clear from the face of the statute or the legislative history"); <u>Ohio v. Johnson</u>, 467 U.S. 493, 499 n.8, 104 S. Ct. 2536, 2541 n.8, 81 L. Ed. 2d 425 (1984) ("[I]f it is <u>evident</u> that a state legislature intended to authorize cumulative punishments, a court's inquiry is at an end." (emphasis added)).  If no clear intention is evident, the provisions are analyzed under the "same elements" test announced in <u>Blockburger v. United States</u>, 284 U.S. 299, 52 S. Ct. 180, 76 L. Ed. 306 (1932), which "inquires whether each offense contains an element not contained in the other; if not, they are the 'same offence' and double jeopardy bars additional punishment and successive prosecution."  <u>United States v. Dixon</u>, 509 U.S. 688, 696, 113 S. Ct. 2849, 2856, 125 L. Ed. 2d 556 (1993).  Although the court will decide under federal law whether a double jeopardy violation has occurred, it must accept the Florida courts' interpretation of the state's own statutes.  <u>Hunter</u>, 459 U.S. at 368.

The Eleventh Circuit summarized its interpretation of Supreme Court law regarding double jeopardy as follows:

> To summarize, our review of a potential double jeopardy violation arising from a single prosecution is a two-stage analysis.  First, we ascertain whether there exists a clear legislative intent to impose cumulative punishments, under separate statutory provisions, for the same conduct.  If a clear indication of such intent exists, our inquiry is at an end and the double jeopardy bar does not apply.  If there is no clear indication of legislative intent to impose cumulative punishments, we examine the relevant statutes under the same-elements test of Blockburger.  Under that test, if each statutory offense requires proof of an element not contained in the other, the offenses are not the "same" and double jeopardy is no bar to cumulative punishment.

Williams v. Singletary, 78 F.3d 1510, 1513 (11th Cir. 1996).

2.      Federal Review of State Court Decision

Petitioner raised this claim as his sixth ground for relief in his Rule 3.850 motion (Doc. 15, Ex. X at 33–34).  In the written opinion denying Petitioner's claim, the state court determined that the charges met the "separate offense" test of Blockburger as each count either contained a unique element or separate victim, thus, the convictions did not place Petitioner in double jeopardy (id. at 138).  Because the state court employed the correct legal rule for analyzing double jeopardy claims, Petitioner is entitled to habeas relief only if he establishes that the state court's application of Blockburger was unreasonable.

The analysis of intent of the Florida Legislature begins by examining the language of the criminal statutes themselves.  As previously noted, at the time of Petitioner's offense conduct, February 10–11, 1996, the Florida statutes defined second degree murder as follows:

> The unlawful killing of a human being, when perpetrated by any act imminently dangerous to another and evincing a depraved mind regardless of human life, although without any premeditated design to effect the death of any particular individual, is murder in the second degree and constitutes a felony of the first degree, punishable by imprisonment for a term of years not exceeding life or as provided in s. 775.082, s. 775.083, or s. 775.084.

Fla. Stat. § 782.04(2) (1995).

The Florida statute criminalizing shooting into a vehicle provided:

> Whoever, wantonly or maliciously, shoots at, within, or into, or throws any missile or hurls or projects a stone or other hard substance which would produce death or great bodily harm, at, within, or in any public or private building, occupied or

unoccupied, or public or private . . . vehicle of any kind which is being used or
occupied by any person . . . shall be guilty of a felony of the second degree,
punishable as provided in s. 775.082, s. 775.083, or s. 775.084.

Fla. Stat. § 790.19 (1995).

The Florida statute criminalizing discharging a firearm from a vehicle within 1000 feet of

a person provided:

Any occupant of any vehicle who knowingly and willfully discharges any firearm
from the vehicle within 1,000 feet of any person commits a felony of the second
degree, punishable as provided in s. 775.082, s. 775.083, or s. 775.084.

Fla. Stat. § 790.15(2) (1995).

The language of the aforementioned statutes provides no answer to the question of whether

the Florida legislature intended to punish second degree murder, shooting into a vehicle, and

discharging a firearm in public as separate offenses; therefore, the court will look to Florida's rules

of statutory construction.  The version of those rules in effect at the time Petitioner committed the

criminal offenses provided, in relevant part:


775.021.  Rules of construction

(1)  The provisions of this code and offenses defined by other statutes shall be
strictly construed; when the language is susceptible of differing constructions, it shall
be construed most favorably to the accused.
. . . .
(4)(a)  Whoever, in the course of one criminal transaction or episode, commits an act
or acts which constitute one or more separate criminal offenses, upon conviction and
adjudication of guilt, shall be sentenced separately for each criminal offense; and the
sentencing judge may order the sentences to be served concurrently or consecutively.
For the purposes of this subsection, offenses are separate if each offense requires
proof of an element that the other does not, without regard to the accusatory pleading
or the proof adduced at trial.

(b)  The intent of the Legislature is to convict and sentence for each criminal offense
committed in the course of one criminal episode or transaction and not to allow the
principle of lenity as set forth in subsection (1) to determine legislative intent.
Exceptions to this rule of construction are:

1. Offenses which require identical elements of proof.

2. Offenses which are degrees of the same offense as provided by statute.

3. Offenses which are lesser offenses the statutory elements of which are subsumed by the greater offense.

Fla. Stat. § 775.021 (1995).  Based upon this language, it is clear that the Florida Legislature expressly intended to convict and sentence a defendant for each offense he commits during the course of a single criminal episode, with three exceptions to that rule.  Fla. Stat. § 775.021(4)(b). The exceptions adopt the Blockburger test.  *See* State v. Weller, 590 So. 2d 923, 925 (1991).

Analysis of the respective criminal statutes in this case shows the absence of a double jeopardy violation as each offense requires proof of an element that the other does not.  As applicable to the offenses charged in the indictment, the offense of aiding and abetting second degree murder has four statutory elements:  (1) the victim, Dana Marie Holbook is dead, (2) the death was caused by the criminal act or agency of Alex Rodas, (3) there was an unlawful killing of Dana Marie Holbrook by an act imminently dangerous to another and evincing a depraved mind regardless of human life, and (4) Petitioner unlawfully aided, abetted, counseled, hired, or otherwise procured Alex Rodas to commit the offense.  *See* The Florida Bar 2007 Florida Standard Jury Instructions in Criminal Cases, Fifth Edition, Part Two:  Instruction on Crimes, Chapter 7.4 Murder - Second Degree (2007) (instruction adopted in 1981 and amended in 1997 to omit "or agency" from second element).  The offense of aiding and abetting shooting into a vehicle or dwelling has four statutory elements:  (1) Alex Rodas shot a firearm, (2) he did so at or into an occupied vehicle or an occupied or unoccupied building, (3) the act was done wantonly or maliciously, and 4) Petitioner unlawfully aided, abetted, counseled, hired, or otherwise procured Alex Rodas to commit the offense. *See id.*, Chapter 10.13 Shooting or Throwing Missiles In Dwelling (instruction adopted in 1981).  The offense of aiding and abetting discharging a firearm from a vehicle within 1000 feet of a person has four statutory elements:  (1) Alex Rodas shot a firearm from a vehicle, (2) at the time Rodas shot the firearm, the vehicle was on the right-of-way of a paved public road, highway, or street, (3) Rodas knowingly and willfully shot the firearm within one thousand feet of a person or persons, and (4) Petitioner unlawfully aided, abetted, counseled, hired, or otherwise procured Alex Rodas to commit the offense.  *See id.*, Chapter 10.6 Discharging a Firearm in Public (instruction adopted in 1981 and amended in 1989); Fla. Stat. § 790.15(2).

An element of second degree murder of Dana Holbrook but not the other two offenses is that Dana Holbrook was killed.  An element of shooting into an occupied vehicle but not second degree murder or shooting from a vehicle within 1000 feet of a person is the element of shooting at or into an occupied vehicle.  An element of shooting from a vehicle within 1000 feet of a person but not second degree murder or shooting into an occupied vehicle is the element of shooting from a vehicle within 1000 feet of a person.  Accordingly, none of the charges relating to the Holbrooks' car became the same offense under the Blockburger test.  Additionally, an element of shooting at or into a building, in this case, the trailer located in Live Oak, but not shooting from a vehicle within 1000 feet of a person is the element of shooting at or into a building.  Finally, none of the offenses are degrees of the same offense as provided by statute, and none of the offenses are lesser included offenses according to the Florida standard jury instructions.  Therefore, Petitioner has failed to demonstrate that the state court's denial of his claim was an unreasonable application of Blockburger.

      C.      Ground three: "Ineffective assistance of counsel relating to co-defendants' relative participations."

Petitioner claims that his counsel performed deficiently by failing to present evidence that the third co-defendant, Martin Palma-Ramos, pled to a charge of accessory after the fact and received a probationary sentence with regard to the murder of Dana Holbrook (Doc. 8 at 5–5A).  Petitioner states that the jury was aware that Alex Rodas, the actual shooter, pled guilty to second degree murder, and that Petitioner was charged as a principal, and the jury could only reason that Petitioner would likewise have to be guilty of second degree murder for his participation in the crime (id. at 5A).  Petitioner states that without the knowledge that Ramos who, like Petitioner, was not the shooter, pled only to a charge of accessory after the fact with regard to the murder, the jury was unaware that they could convict Petitioner of a lesser degree of culpability than Alex Rodas (id.).

Respondent concedes that Petitioner exhausted this claim in the state courts (Doc. 22 at 13).

      1.      Clearly Established Supreme Court Law

The standard for evaluating claims of ineffective assistance of counsel is set forth in Strickland v. Washington, 466 U.S. 668, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984).  To obtain relief

under Strickland, Petitioner must show (1) deficient performance by counsel and (2) a reasonable probability that, but for counsel's deficient performance, the result of the proceeding would have been different. 466 U.S. at 687–88. If Petitioner fails to make a showing as to either performance or prejudice, he is not entitled to relief. *Id.* at 697. Thus, this court need not address the prejudice prong if the court determines that the performance prong is not satisfied. Turner v. Crosby, 339 F.3d 1247, 1279 (11th Cir. 2003); Holladay v. Haley, 209 F.3d 1243, 1248 (11th Cir. 2000) ("Because both parts of the test must be satisfied in order to show a violation of the Sixth Amendment, the court need not address the performance prong if the defendant cannot meet the prejudice prong, or vice versa.") (citation omitted).

"The petitioner's burden to prove, by a preponderance of the evidence, that counsel's performance was unreasonable is a heavy one." Jones v. Campbell, 436 F.3d 1285, 1293 (11th Cir. 2006) (citing Chandler v. United States, 218 F.3d 1305, 1313 (11th Cir. 2000) (en banc)). The focus of inquiry under the performance prong is "reasonableness under prevailing professional norms." Strickland, 466 U.S. at 688–89. "Judicial scrutiny of counsel's performance must be highly deferential," and courts should make every effort to "eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time." *Id.* at 689. If the record is not complete regarding counsel's actions, "then the courts should presume 'that what the particular defense lawyer did at trial—for example, what witnesses he presented or did not present—were acts that some lawyer might do." Jones, 436 F.3d at 1293 (citing Chandler, 218 F.3d at 1314–15 n.15). Furthermore, "[e]ven if many reasonable lawyers would not have done as defense counsel did at trial, no relief can be granted on ineffectiveness grounds unless it is shown that no reasonable lawyer, in the circumstances, would have done so." Rogers v. Zant, 13 F.3d 384, 386 (11th Cir. 1994). Counsel's performance is deficient only if it is "outside the wide range of professional competence." Jones, 436 F.3d at 1293 (citing Strickland, 466 U.S. at 690); Lancaster v. Newsome, 880 F.2d 362, 375 (11th Cir. 1989) (emphasizing that petitioner was "not entitled to error-free representation").

Moreover, "[c]ounsel will not be deemed unconstitutionally deficient because of tactical decisions." McNeal v. Wainwright, 722 F.2d 674, 676 (11th Cir. 1984) (citations omitted); Crawford v. Head, 311 F.3d 1288, 1312 (11th Cir. 2002) ("Deliberate choices of trial strategy and

tactics are within the province of trial counsel after consultation with his client.  In this regard, this court will not substitute its judgment for that of trial counsel.") (quotation marks, internal alteration, and citation omitted).  There is a strong presumption that counsel's performance was reasonable and adequate, with great deference being shown to choices dictated by reasonable strategy.  Rogers, 13 F.3d at 386; see also Conklin v. Schofield, 366 F.3d 1191, 1204 (11th Cir. 2004).  "[T]here are no 'absolute rules' dictating what reasonable performance is or what line of defense must be asserted."  Michael v. Crosby, 430 F.3d 1310, 1320 (11th Cir. 2005) (quoting Chandler, 218 F.3d at 1317).  Indeed, "'[a]bsolute rules would interfere with counsel's independence—which is also constitutionally protected—and would restrict the wide latitude counsel have in making tactical decisions.'"  Id. (quoting Putman v. Head, 268 F.3d 1223, 1244 (11th Cir. 2001)).

Counsel's decision whether to call a particular witness is a matter of trial strategy entitled to great deference.  Chandler, 218 F.3d at 1314 n.14 (citing Waters v. Thomas, 46 F.3d 1506, 1512, 1518-19 (11th Cir. 1995) (en banc)).  "The mere fact that other witnesses might have been available or that other testimony might have been elicited from those who testified is not a sufficient ground to prove ineffectiveness of counsel."  Waters, 46 F.3d at 1514.  "Complaints of uncalled witnesses are not favored, because the presentation of testimonial evidence is a matter of trial strategy and because allegations of what a witness would have testified are largely speculative."  Buckelew v. United States, 575 F.2d 515, 521 (5th Cir. 1978).[4]

2.      Federal Review of State Court Decision

Petitioner raised this claim as ground eight in his Rule 3.850 motion (Doc. 15, Ex. X at 62–63).  In the state court's written opinion denying Petitioner's Rule 3.850 motion, the state court identified Strickland as setting forth the controlling legal standard for analyzing claims of ineffective assistance of counsel (id. at 139).  The state court found as fact that the only indication of the substance of Ramos' potential testimony was his statement to Special Agent Rapodo, in which Ramos indicated that Petitioner was involved in the crimes for which he was charged (id.).  The state

---

[4]In Bonner v. City of Prichard, 661 F.2d 1206 (11th Cir. 1981) (en banc), the Eleventh Circuit adopted as binding precedent all former Fifth Circuit decisions rendered before October 1, 1981.

court determined that Petitioner failed to show that the presentation of Ramos' testimony regarding his plea would have affected the outcome of the trial (*id.*).

As previously discussed, the testimony of Alex Rodas regarding the Holbrook murder was that Petitioner recruited him, supplied the gun, ensured that it was loaded when he shoved it to Rodas, told Rodas to shoot at the Holbrooks' car, positioned his car in a manner that enabled Rodas to shoot into the Holbrooks' car, and sped away after the shooting (*id.*).  Rodas testified that Ramos' involvement with regard to the murder was telling him (Rodas) to shoot at the Holbrooks' car.  The evidence supported a much higher degree of culpability as to Petitioner than Ramos, such that even if Ramos had testified that he pled guilty to accessory after the fact to the Holbrook murder, there is no reasonable probability that the outcome of the trial would have been different.  Therefore, Petitioner failed to establish that the state court decision was an unreasonable application of Strickland.

   D.   Ground four: "Ineffective assistance of counsel relating to defective jury instructions."

Petitioner contends his counsel should have objected to the jury instructions on the following five grounds:  (1) the jury instructions on each of the degrees of homicide were defective because they failed to instruct the jury that the State had to prove Petitioner's intent, either his "direct state of mind" or, under a principal theory, that he knew that Co-defendant Rodas possessed the requisite state of mind, (2) the "depraved mind" instruction did not include a statement that if the act was done by anyone other than the defendant, the defendant himself must possess this state of mind or, if possessed by the co-defendant, be aware that the co-defendant possessed it, (3) the instruction for second degree murder should have included the language, "that a crime was committed during the transaction," instead of specifically referring to Alex Rodas by stating, "Alphonso Saravia unlawfully aided, abetted, counseled, hired or otherwise procured Alex Rodas to commit the offense," (4) the instructions should have included an instruction on the lesser included offense of manslaughter by culpable negligence because the evidence and Petitioner's defense theory supported the instruction, and (5) the instruction on principal liability included language that had been added

to the standard instruction in an amendment that occurred after the date of the offenses, which constituted an ex post facto violation (Doc. 8 at 5–5A).

Respondent concedes that Petitioner exhausted his claim in the state courts (Doc. 22 at 18).

        1.      Clearly Established Supreme Court Law

As previously discussed, the clearly established federal law governing claims of ineffective assistance of counsel is the two prong standard set forth in <u>Strickland v. Washington</u>.

        2.      Federal Review of State Court Decision

Petitioner raised this claim as his ninth claim for relief in his Rule 3.850 motion (Doc. 15, Ex. X at 64–71).  In the written opinion denying Petitioner's claim, the state court determined that the jury instructions were "adequate and proper" based upon the crimes charged (*id.* at 139). Applying the <u>Strickland</u> standard, the state court concluded that Petitioner failed to show that counsel's performance was unreasonable under the prevailing norms, and he failed to show that counsel's performance probably affected the outcome of trial (*id.*).

      a.    <u>The jury instructions on the degrees of homicide were defective because they failed to instruct the jury that the State had to prove Petitioner's intent, either his "direct state of mind" or, under the principal theory of liability, that Petitioner knew that Co-defendant Rodas possessed the requisite state of mind.</u>

      b.    <u>The "depraved mind" instruction did not include a statement that if the act was done by anyone other than the defendant, the defendant himself must possess this state of mind or, if possessed by the co-defendant, be aware that the co-defendant possessed it.</u>

In Petitioner's first sub-claim, he contends his counsel should have objected to the jury instructions regarding the degrees of homicide on the ground that they lacked the state of mind element as to each offense (Doc. 8 at 5).  In his second sub-claim, he makes the same argument specifically with regard to the instructions regarding aiding and abetting second degree murder (*id.* at 5A).  Petitioner contends the jury should have been instructed that the State must prove either that he possessed a "depraved mind" or that he knew that Co-defendant Rodas possessed that state of mind.

This court must accord deference to the state court's decision to the extent it decides the validity of Petitioner's underlying state law claim, that is, whether the jury instructions regarding

the degrees of homicide adequately and properly stated Florida law, while reserving for federal habeas review the ultimate issue of whether the state court's decision on the ineffective assistance of counsel claim was unreasonable.  *See* Cargill v. Turpin, 120 F.3d 1366, 1381 (11th Cir. 1997) (federal courts are not at liberty to challenge the state court's determination of state law); Alvord v. Wainwright, 725 F.2d 1282, 1291 (11th Cir. 1984).  Following this analysis, it is clear that the state court held that, as a matter of state law, the instructions were adequate and proper with regard to the intent element of each degree of homicide (Doc. 15, Ex. X at 139).  In light of this determination, Petitioner failed to show that his counsel performed unreasonably by failing to object to the instructions on the ground that they failed to properly instruct the jury on the intent element of each degree of homicide. Furthermore, the state court's determination of the state law issue precludes a finding of prejudice resulting from counsel's alleged error, as Petitioner cannot establish a reasonable probability that the trial court would have sustained counsel's objection to the instructions. Therefore, Petitioner has failed to show that the state court's denial of his ineffective assistance of counsel claim was an unreasonable application of Strickland.  *See* Callahan v. Campbell, 427 F.3d 897, 932 (11th Cir. 2005) (state court's determination that objection to admission of evidence, based on state law, would have been overruled foreclosed federal habeas petitioner from showing that counsel was deficient for failing to make that objection, and it foreclosed petitioner's ability to demonstrate prejudice).

> c.    The instruction on aiding and abetting second degree murder should have used the language in the standard instruction on principals instead of specifically referring to Co-defendant Rodas by stating, "Alphonso Saravia unlawfully aided, abetted, counseled, hired or otherwise procured Alex Rodas to commit the offense."

Petitioner contends he was prejudiced by the jury instruction on aiding and abetting second degree murder because the instruction identified Alex Rodas as the person who Petitioner aided and abetted, instead of referring generally to an unidentified person, and the jury knew that Alex Rodas was guilty of second degree murder because Rodas testified that he pled to the charge (Doc. 8 at 5A).  Petitioner claims that his counsel should have objected to the instruction on this ground.

Initially, Petitioner has not provided any basis in Florida law for counsel's objecting to the instruction on the ground that it specifically identified Rodas as the person who Petitioner aided in

the commission of the murder.  Furthermore, as determined by the state court, the jury instructions accurately stated Florida law with respect to principal liability for second degree murder, and they accurately identified the actor upon whose conduct Petitioner's principal liability was based. Therefore, Petitioner failed to show that his counsel had a meritorious basis for objecting to the instruction.  Additionally, Petitioner failed to show a reasonable probability that the result of the trial would have been different if counsel had requested removal of Rodas' name from the instruction. The undisputed evidence, including Petitioner's testimony, showed that Rodas was the shooter. Therefore, even if the jury instruction did not identify Rodas as the actual perpetrator and merely stated that Petitioner aided and abetted the person who shot Dana Holbrook, it was obvious from the evidence that that person was Rodas.  Accordingly, Petitioner has failed to establish that the state court's denial of this claim was an unreasonable application of <u>Strickland</u>.

> d.    <u>The instructions should have included an instruction on the lesser included offense of manslaughter by culpable negligence because the evidence and Petitioner's defense theory supported the instruction.</u>

Petitioner claims that his counsel should have requested an instruction on the lesser included offense of manslaughter by culpable negligence because the evidence and Petitioner's theory of defense supported this instruction (Doc. 8 at 5B).

As discussed in Ground one above, the evidence presented at Petitioner's trial was sufficient to sustain a conviction for aiding and abetting second degree murder.  As such, even assuming without deciding that Petitioner's counsel was deficient in failing to request a jury instruction on manslaughter by culpable negligence, that deficiency does not suggest that there was a reasonable probability that the outcome would have been different because the jury had sufficient evidence to find Petitioner guilty of the greater offense of aiding and abetting second degree murder.  *See* <u>Magnotti v. Secretary for Dept. of Corrections</u>, 222 Fed. Appx. 934, 940 (11th Cir. 2007) (citing <u>Strickland</u>, 466 U.S. at 693–94 (explaining that a reviewing court should presume that the jury acted according to law)).[5]  Therefore, Petitioner's argument, that the jury would have convicted him of a lesser offense had it been given the instructions on such an offense, is not conclusive where the jury

---

[5]The undersigned cites <u>Magnotti v. Secretary for Dept. of Corrections</u> only as persuasive authority and recognizes that the opinion is not considered binding precedent. *See* 11th Cir. R. 36-2.

properly convicted him of aiding and abetting second degree murder based upon the evidence presented at trial.  Furthermore, the jury would have performed its duties in violation of the law had it convicted Petitioner of a lesser offense in the face of sufficient evidence for the greater offense. *See* Strickland, 466 U.S. at 493–94 (holding that "[a] defendant has no entitlement to the luck of a lawless decisionmaker, even if a lawless decision cannot be reviewed.  The assessment of prejudice should proceed on the assumption that the decisionmaker is reasonably, conscientiously, and impartially applying the standards that govern the decision.  It should not depend on the idiosyncracies of the particular decisionmaker, such as unusual propensities toward harshness or leniency").  Moreover, the jury was instructed on aiding and abetting third degree murder and aiding and abetting manslaughter by intentional act (*see* Doc. 15, Ex. H at 571–74), yet they convicted him of the greater offense of aiding and abetting second degree murder.  Because Petitioner failed to show that he suffered prejudice as a result of his counsel's alleged error, he has failed to establish that the state court's denial of this claim was an unreasonable application of Strickland.

> e.    The instruction on principal liability included language that had been added to the standard instruction in an amendment that occurred after the date of the offenses, which constituted an ex post facto violation.

Petitioner contends that after the offense conduct occurred, the standard jury instruction on principal liability changed, but his counsel failed to object to use of the amended instruction.

 Prior to December 7, 1995, the jury instruction on principals stated:

> If two or more persons help each other [commit] [attempt to commit] a crime and the defendant is one of them, the defendant is a principal and must be treated as if [he][she] had done all the things the other person or persons did if the defendant:  (1) knew what was going to happen (2) intended to participate actively or by sharing in an expected benefit and, (3) actually did something by which [he][she] intended to help [commit] [attempt to commit] the crime.

Standard Jury Instructions in Criminal Cases, 665 So. 2d 212, 214 (Fla. 1995).  The instruction was amended to state:

> If the defendant helped another person or persons [commit] [attempt to commit] a crime, the defendant is a principal and must be treated as if [he] [she] had done all the things the other person or persons did if:  (1) the defendant had a conscious intent that the criminal act be done, and (2) the defendant did some act or said some word which was intended to and which did incite, cause, encourage, assist or advise the other person or persons to actually [commit] [attempt to commit] the crime.

*Id.* at 214.  At the time Petitioner's crimes occurred, February 10–11, 1996, the Florida Standard Jury Instruction on principals had already been amended.  Standard Jury Instruction in Criminal Cases (95-2), 665 So. 2d 212 (Fla. 1995).  Therefore,  Petitioner's counsel had no meritorious basis for arguing that the amended instruction was retroactively applied in his case.  Counsel's failure to make meritless objections is not unreasonable, *see* <u>Card v. Dugger</u>, 911 F.2d 1494, 1520 (11th Cir. 1990) ("Counsel cannot be labeled ineffective for failing to raise issues which have no merit."); therefore, Petitioner failed to demonstrate that the state court unreasonably applied <u>Strickland</u> in denying his claim.


      E.      <u>Ground five:  "Petitioner was unconstitutionaly [sic] sentenced."</u>

      Petitioner expressly abandoned this claim in light of his state resentencing (*see* Doc. 25 at 1); therefore, no further discussion of this claim is warranted.

      F.      <u>Ground six:  "Cumulative effect."</u>

      Petitioner claims that the cumulative effect of the errors set forth in grounds one through four deprived him of his right to a fair trial (Doc. 8 at 6A).  Respondent concedes that Petitioner exhausted this claim in the state courts.  Respondent contends that because the United State Supreme Court has not established a cumulative error analysis for federal habeas claims, Petitioner cannot show that the state court's denial of his claim entitles his to federal habeas relief under § 2254(d) (Doc. 22 at 26–28).

      As previously discussed, none of the alleged errors of trial counsel, considered alone, approach the threshold standard of ineffective assistance of counsel. Taken together, their cumulative effect also falls far short of depriving Petitioner of effective assistance of counsel or of rendering Petitioner's trial fundamentally unfair.  Likewise, as previously discussed, none of the alleged trial court errors, considered alone, approach the threshold of fundamental unfairness. Taken together, their cumulative effect also falls far short of rendering Petitioner's trial fundamentally unfair.  Because the undersigned cannot say that Petitioner's trial, as a whole, was "fundamentally unfair and outside of the bounds of the Constitution," Petitioner is not entitled to relief on his "cumulative effect" claim.  *See* <u>Conklin</u>, 366 F.3d at 1210 (habeas petitioner not entitled to federal

habeas relief on claim that "cumulative effect" of incidents that occurred during trial violated due process where petitioner's trial as a whole, was not "fundamentally unfair or outside of the bounds of the Constitution"); Bronstein v. Wainwright, 646 F.2d 1048 (11th Cir. 1981) ("[A] state trial must be so 'fundamentally unfair' as to amount to a denial of due process before federal habeas relief can be appropriately applied.") (internal quotation and citation omitted).

Accordingly, it is **ORDERED**:

The clerk of court is directed to change the docket to reflect that Walter McNeil is substituted for James McDonough as Respondent.

And it is respectfully **RECOMMENDED**:

That the amended petition for writ of habeas corpus (Doc. 8) be **DENIED**.

At Pensacola, Florida, this 16th day of October 2008.


/s/ Elizabeth M. Timothy
**ELIZABETH M.  TIMOTHY**
**UNITED STATES MAGISTRATE JUDGE**



**NOTICE TO THE PARTIES**

Objections to these proposed findings and recommendations may be filed within ten (10) days after being served a copy thereof.  **Any different deadline that may appear on the electronic docket is for the court's internal use only, and does not control.**  A copy of objections shall be served upon the magistrate judge and all other parties.  Failure to object may limit the scope of appellate review of factual findings. *See* 28 U.S.C. § 636; United States v. Roberts, 858 F.2d 698, 701 (11th Cir. 1988).